UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:10-CV-9

DORIS GIFFORD                                                                                    PLAINTIFF

v.

AMERICAN RIVER
TRANSPORTATION CO.                                                                      DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant's Motion for Summary Judgment (Docket #23). Plaintiff has responded (Docket #30). Defendant has replied (Docket #31). This matter is now ripe for adjudication. For the following reasons, Defendant's motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Plaintiff Doris Gifford began working as a cook for American River Transportation Company ("ARTCO") in 2005. On October 2, 2008, Plaintiff alleges she sustained injury to her right arm and hand while lifting a frozen turkey from a chest freezer onboard the M/V COOPERATIVE SPIRIT.

At the time Plaintiff's injury occurred, the vessel was dry docked in Paducah, Kentucky, for repairs. Plaintiff worked in the galley, which was located on the first deck near the middle of the boat. The galley contained a two door, reach-in freezer located along the back wall. Two additional chest freezers, which opened from the top, were located in the deck locker at the front of the boat.

The galley freezer was old and frequently stopped working, often requiring repair or a manual defrost. During dry dock, the galley freezer was to be fixed or replaced. It was not

working on October 2, 2008, and there was no food in it.  Instead, food was stored in one of the chest freezers in the deck locker.[1]  Plaintiff would move food for two to three days of meals from the chest freezers to the working refrigerator in the galley to thaw.

John Kennedy, an engineer, was helping Plaintiff move food on the day she was injured.  He took an armload of food while Plaintiff retrieved the frozen turkey.  The turkey was at the bottom of one of the chest freezers, wrapped in plastic.  Plaintiff asserts in her deposition that although she did not weigh the turkey, she had ordered a 30-pound turkey.[2]  Plaintiff admits she could have waited and asked Mr. Kennedy or another crew member to move the turkey.

Instead, Plaintiff opened the chest freezer lid and held it up with her left arm while she reached in with her right hand.  She bent over almost far enough for her hand to reach the floor and pulled the turkey up from the bottom of the freezer by its packaging.  During this time, Plaintiff felt pain in her forearm, which felt as though she had been stabbed.  Plaintiff testified that she had never experienced any kind of pain like it before.

> I got ahold of the turkey, I was lifting it up, when I got it to a point where I – I
> was moving my arm, then it – it felt like a tear, a stab, a whatever, and I just
> continued on up with it.

Pl's Depo., DN 23-1, p. 29.  She continued lifting the turkey with her right hand until she got it near the top and then she "bear hugged it."  Pl.'s Depo., DN 23-1, p. 28.  Plaintiff stood up and

---

[1]The other freezer was used to store food scraps, or "slop."

[2]The parties dispute the weight of the turkey.  On her injury report dated October 9, 2008, Plaintiff indicated that the turkey weighed 22 pounds.  In her deposition, she testified that the turkey weighed 30 pounds.  Defendant has presented a receipt dated September 29, 2008, indicating that a turkey ordered at that time weighed just 10.850 pounds.  In addition, Defendant has presented documentation of Plaintiff's request for a turkey dated September 29, 2008, which does not indicate a requested weight.

carried the turkey to the galley, a trip she estimated took about thirty seconds to a minute.

After putting the turkey in the refrigerator, Plaintiff checked to see if her arm was bleeding.  It was not, but the pain continued, so she got an elastic bandage and wrapped it around her arm.  Plaintiff testified that she told the first mate, Scott Tippet, that she thought she had pulled a muscle.  She did not fill out an injury report at that time.  Scott Tippett testified that Plaintiff never spoke with him about her injury that day; if she had, he would have made her fill out an injury report.  Plaintiff continued performing her work duties the rest of the day and for the next week until October 9, 2008.  She then left the boat to seek medical treatment at a clinic.

At the clinic, Plaintiff's arm pain was diagnosed as a pulled muscle and she was sent to Calvert City, Kentucky, for physical therapy.  Physical therapy did not help so she was given a hand brace.  Plaintiff then saw Dr. Ted Jefferson, a surgeon, who performed carpal tunnel release surgery on her hand on January 8, 2009.  The surgery and following therapy did not ease Plaintiff's pain.  Plaintiff took a functional capacity exam on February 24, 2009.  Based on this test, Dr. Jefferson determined that Plaintiff could work at a light-medium physical demand level for an eight-hour day.  Dr. Jefferson released Plaintiff to return to work on March 9, 2009, with restrictions including no lifting over 28 pounds and no pulling or pushing over 35 pounds.  Carol Jerrell, ARTCO's personnel manager, sent a letter to Plaintiff directing her to return to work, but Plaintiff states that she never received this letter.  When Plaintiff failed to report for work on March 19, 2009, the company processed her resignation for job abandonment.

Plaintiff worked at a restaurant in Calvert City, Kentucky, in April of 2009.  She has not been employed since then and is currently drawing Social Security disability benefits.  She also continues to seek treatment for her arm pain.  She met with Dr. Michael Beatty in Edwardsville,

Illinois, who diagnosed Plaintiff as suffering from radial neuropathy and muscle injury. Dr. Beatty indicated he would perform surgical exploration of the radial nerve if she had the ability to pay for the operation. Plaintiff was also examined by Dr. Susan MacKinnon for the purpose of determining whether Plaintiff's symptoms warranted surgery. Based on Dr. MacKinnon's findings and Dr. Jefferson's prior conclusions, Defendant declined to pay for the surgery recommended by Dr. Beatty. Plaintiff continues to experience pain in her arm and is taking Lortab for the pain, although she had a prescription for Lortab prior to her injury to treat other problems.

Plaintiff was diagnosed with lupus over twenty years ago but she never disclosed her condition to ARTCO, despite completing a pre-employment medical questionnaire and pre-employment physical. She also never disclosed that she had lupus to the physicians who treated her for arm pain after October 2, 2008. Defendant did not learn about Plaintiff's condition until the parties engaged in discovery for purposes of this litigation.

Plaintiff filed suit in this Court on January 19, 2010. After learning of Plaintiff's lupus, Defendant filed an amended answer and counterclaim on March 14, 2011. Defendant moved for summary judgment as to Plaintiff's claims on March 29, 2011. This matter is currently set for a bench trial on August 10, 2011. The Court now considers Defendant's motion.

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

Plaintiff's Complaint asserts three claims for relief: (I) Jones Act negligence, (II) general maritime law unseaworthiness, and (III) maintenance and cure. Defendant asserts that summary judgment should be granted as to all claims.

### I.    Jones Act Negligence

The Jones Act provides that "[a] seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104. In general, to establish negligence under the Jones Act, "'a plaintiff must show that her employer failed to provide a safe workplace by neglecting to cure or eliminate obvious dangers of which the employer or its agents knew or should have known and that such failure

caused the plaintiff's injuries and damages.'" *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372,

383 (6th Cir. 2008) (quoting *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 449 (6th Cir. 2001)).

The burden of proof on the issue of causation is relaxed under the Jones Act. *Id.* However,

"[t]he mere fact that an accident occurs or that injury is sustained does not prove negligence."

*Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999).

Defendant asserts that there is no genuine issue of material fact as to the issue of

negligence because Plaintiff was performing the normal, routine activities of her job at the time

she was injured. *See Harrison v. Seariver Maritime, Inc.*, 61 F. App'x 119, No. 02-40307, 2003

WL 342266, at *5 (5th Cir. 2003) ("Ordinary prudence is exercised when a safe procedure is

used for a routine task, even when a safer procedure might exist."). Lifting a turkey, Defendant

argues, is a routine task for a cook on a boat. In addition, Defendant points out that Plaintiff

could have asked for assistance from one of the other crew members. Plaintiff acknowledged in

her deposition that she could have asked for help lifting the turkey from the freezer. She noted

that other crew members helped carry food when they were available. But Plaintiff chose not to

wait for help and instead reached into the freezer to retrieve the turkey herself. In contrast,

Plaintiff argues that she was not performing a routine duty because she was required to lift the

turkey from a chest freezer in the deck locker rather than from the reach-in freezer located in the

galley.

Certainly there is no dispute that lifting food is a routine task of a cook, whether the cook

works on a boat or elsewhere. Thus, the only matter for the Court's consideration is whether

requiring Plaintiff to lift food from the chest freezer was unsafe. Plaintiff believes that the chest

freezer procedure was unsafe because it required her to lift heavy items with only one hand, as

opposed to two, and an inference can be drawn that this process was unsafe because it was not

the normal procedure utilized on the boat.  Plaintiff supports these inferences with evidence

demonstrating that the chest freezers were not utilized for food storage when the galley freezer

was operational and testimony regarding the physical operation of the chest freezer.

In light of the "'very low evidentiary threshold'" required for Jones Act cases at the

summary judgment stage, the Court will allow this claim to proceed to trial.  *Daughenbaugh v.*

*Bethlehem Steel Corp., Great Lakes S.S. Div.*, 891 F.2d 1199, 1205 (6th Cir. 1989) (quoting

*Leonard v. Exxon Corp.*, 581 F.2d 522, 524 (5th Cir. 1978), *cert. denied*, 441 U.S. 923 (1979)).

Accordingly, Defendant's motion for summary judgment is denied as to Plaintiff's Jones Act

claim.

## II.     Unseaworthiness

Plaintiff has also sued Defendant for unseaworthiness under the general maritime law of

the United States.  "Under the seaworthiness doctrine, there is an absolute duty to maintain a

seaworthy ship, the breach of which imposes liability without fault, i.e., strict liability."  *Perkins*

*v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 602 (6th Cir. 2001).  This obligation extends

to the vessel and its appurtenances.  *Id.*

> A vessel is unseaworthy if the vessel and its appurtenances are not reasonably fit
> for their intended use.  Defective gear, an unfit or understaffed crew, or the use of
> an improper method of storage or unloading cargo all render a vessel
> unseaworthy.  Even the misuse of properly functioning equipment may render a
> vessel unseaworthy if the misuse occurs at the direction of a superior.

*Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 904 (6th Cir. 2006) (internal quotation

marks and citations omitted).  "However, a vessel need not be 'free from all possibility of

mishap, for the seaworthiness of a ship is a relative concept, dependent in each instance upon

7

circumstances.'" *Perkins*, 246 F.3d at 602 (quoting *Brown v. Dravo Corp.*, 258 F.2d 704, 706 (3d Cir. 1958)). "To prove an unseaworthiness claim, a plaintiff must show that the unseaworthy condition of the vessel was the substantial and direct or proximate cause of the plaintiff's injuries." *Id.* (citing *Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir. 1993)). "Generally, unseaworthiness is a question of fact for the jury and should not be resolved by the district court as a matter of law." *Churchwell*, 444 F.3d at 904.

There is no evidence in this case that the chest freezer was unfit for storing frozen food. Nor is there any evidence that the chest freezer was not in proper working condition or that it was not being used for its intended purpose. Instead, Plaintiff argues that the properly functioning equipment was misused. Plaintiff bases this argument upon the fact that Defendant did not consider the chest freezer reasonably fit for the storage of heavy food items. To support this claim, Plaintiff notes that a reach-in freezer was normally used in the galley and the chest freezers were used only to store scraps. In addition, it can be inferred that Plaintiff was acting under the direction of her superiors in moving the food to the chest freezer when the galley freezer malfunctioned. The Court finds that Plaintiff has presented enough evidence to create a genuine issue of material fact as to whether the chest freezer was being misused at the direction of her superior.

Defendant also argues, however, that Plaintiff cannot establish that the misuse of the chest freezer was the direct or proximate cause of her injuries. In support of this argument, Defendant notes that the action of lifting a frozen turkey caused Plaintiff's alleged injuries, as she stated in her injury report. In other words, Defendant asserts, Plaintiff's injury was not caused by any appurtenance on the vessel. Defendant's argument overlooks Plaintiff's testimony

regarding how she had to retrieve the turkey out of the chest freezer. It appears that Plaintiff's

unseaworthiness argument focuses on the manner in which she was required to lift the turkey,

not merely the lifting of the turkey itself. Thus, the Court believes there remains a genuine issue

of material fact as to whether the manner in which Plaintiff retrieved the turkey was a substantial

and direct or proximate cause of her injuries. Finally, Defendant argues that Plaintiff's lupus

prevents her from claiming that lifting the turkey from the freezer was a proximate cause of her

injury. Plaintiff's physical condition and the effects of lupus on her body remain matters of

factual dispute. Thus, the Court cannot grant summary judgment on this basis. Accordingly,

summary judgment is denied as to Plaintiff's unseaworthiness claim.

### III.     Maintenance and Cure

A shipowner's duty to provide maintenance and cure "arises regardless of fault and

whether or not employment on the ship actually caused the seaman's injury." *Cunningham v.

Interlake S.S. Co.*, 567 F.3d 758, 761 (6th Cir. 2009). Maintenance refers to the shipowner's

duty to provide food and lodging while cure is the shipowner's duty to provide medical care and

attention "during the period of injury or illness." *Id.* In order to recover for maintenance and

cure, Plaintiff must demonstrate that "(1) he was working as a seaman, (2) he became ill or

injured while in the vessel's service, and (3) he lost wages or incurred expenditures relating to

the treatment of the illness or injury." *West v. Midland Enterprises, Inc.*, 227 F.3d 613, 616 (6th

Cir. 2000). Any ambiguities or doubts should be resolved in favor of Plaintiff. *Id.* (quoting

*Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962)).

Defendant argues that Plaintiff is prohibited from recovering maintenance and cure

because Plaintiff intentionally concealed a preexisting medical condition.

> "[W]here the shipowner requires a seaman to submit to a pre-hiring medical examination or interview and the seaman intentionally misrepresents or conceals material medical facts, the disclosure of which is plainly desired, then he is not entitled to an award of maintenance and cure. Of course, the defense that a seaman knowingly concealed material medical information will not prevail unless there is a causal link between the pre-existing disability that was concealed and the disability incurred during the voyage."

*Id.* at 617 (quoting *McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d 547, 549 (5th Cir. 1968)).

Thus, an employer asserting this defense must establish that (1) the seaman intentionally misrepresented or concealed medical facts, (2) such facts were material, and (3) a causal connection exists between the concealed medical facts and the seaman's injury. *See id.*; *accord Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005). Plaintiff asserts that there is a genuine issue of material fact as to all three elements of her employer's defense.

### A. Intentionally Misrepresented or Concealed Medical Facts

According to Fifth Circuit precedent, the intentional concealment prong of *McCorpen* is essentially an objective inquiry. *Brown*, 410 F.3d at 174. In *Brown*, the Fifth Circuit noted that where an interview or questionnaire requests disclosure of material medical facts and the seaman fails to provide such facts, the intentional concealment prong is satisfied. *Id.* (internal citations omitted). "*McCorpen*'s intentional concealment prong neither necessarily turns on credibility nor requires a subjective determination." *Id.* at 175. The seaman in *McCorpen* completed a questionnaire "obviously designed to elicit information about past illnesses of importance" and failed to reveal that he had diabetes. *McCorpen*, 396 F.2d at 549. In such a case, the Fifth Circuit held that it need not consider the seaman's good faith belief he was fit for duty. *Id.*

Instead of applying the test set forth in *McCorpen*, Plaintiff urges the Court to adopt the test set forth by the Second Circuit regarding Plaintiff's intent. The Second Circuit adopts a

10

more subjective inquiry when determining whether a plaintiff's concealment was intentional. *See Sammon v. Central Gulf S.S. Corp.*, 442 F.2d 1028, 1029 (2d Cir. 1971). Under the Second Circuit's test, "[t]he concealment of a previous condition is fraudulent only if the seaman knows or reasonably should know that the concealed condition is relevant." *Id.* The Court is precluded, however, from considering the Second Circuit's approach because the Sixth Circuit has already adopted the *McCorpen* test and its progeny. *See West*, 227 F.3d at 617. Further, the Court believes *Brown*'s reasoning is persuasive:

> Employers need to be certain that each employee is physically able to do the work, not only to protect the employer from liability, but also to protect the employees. This is the purpose of the preemployment health questionnaire, and of the *McCorpen* defense. Seamen must not be allowed to blatantly misrepresent their medical history on questionnaires and then plead ignorance before a jury.

410 F.2d at 175. Finding *McCorpen* and its progeny persuasive, the Court declines to adopt the Second Circuit test.

Plaintiff also argues that the Court should consider her intelligence level and ability to read and write when judging whether her omission on the medical form was intentional concealment. In support of this argument, Plaintiff cites to *Gregory v. Kirby Inland Marine, L.P.*, No. 08-4183, 2009 WL 1402229, at *6 (E.D. La. May 14, 2009). *Gregory* notes that "[m]aintenance has been allowed . . . in cases in which the courts found the seamen 'so ignorant that it could not be said they knowingly concealed pertinent medical facts.'" *Id.* (quoting *Brown*, 410 F.3d at 175). Cases which have applied this precedent, however, are easily distinguishable from the present case. Although Plaintiff notes that she did not graduate from high school, there is no evidence that she cannot "read, write, speak, and understand English . . . ." *See McCorpen*, 396 F.2d at 549-50 (noting that those cases where seamen were deemed ignorant involved

11

seamen who barely understood English or had severe language difficulties).  There is sufficient

evidence within the record to demonstrate that Plaintiff has these skills.

In this case, Plaintiff concealed her lupus on a medical questionnaire and during her pre-

employment physical, and there is no reason for deeming her so ignorant as to be unable to

knowingly conceal her medical illness.  Thus, the Court finds that Defendant has satisfied the

first prong of the *McCorpen* defense.

### B. Materiality

Next, Defendant must establish that the information Plaintiff concealed was material to

Defendant's hiring decision.  *See Ramirez v. Am. Pollution Control Corp.*, No. 10-40911, 2011

WL 867089, at *2 (5th Cir. Mar. 14, 2011) (citing *Brown*, 410 F.3d at 171).  "If the vessel owner

would have employed the seaman even had the requested disclosure been made, concealment

will not bar the seaman's recovery of maintenance and cure."  *Jauch v. Nautical Servs., Inc.*, 470

F.3d 207, 212 (5th Cir. 2006).  In *McCorpen*, where the evidence demonstrated that an applicant

with diabetes would have been subject to further investigation before being hired, the Fifth

Circuit rejected the seaman's argument that concealment of diabetes was not material.  396 F.2d

at 550-51.

Defendant presents the affidavit of Dr. Noah L. Still.  Dr. Still was responsible for

reviewing the pre-employment physicals and medical history forms of ARTCO applicants.  He

determined whether the applicant could be hired or if further investigation was necessary.  At the

time Plaintiff applied, Dr. Still reviewed her application and physical and determined that she

could be hired immediately.

> Had Ms. Gifford disclosed she had lupus, I would have required an investigation
> into the current status of her medical condition, medical records from her treating

physicians, and an analysis of those records to determine how far the disease had advanced and whether she could safely perform the work of a towboat cook.

I would not have declared Ms. Gifford fit to work as a towboat cook without such an investigation and review and ARTCO would not have hired her at that time.

Dr. Still Aff., DN 23-10, p. 2. Defendant asserts that because further investigation would have been necessary, there is no genuine issue of material fact as to whether the facts concealed by Plaintiff were material. The Court agrees.

### C. Causal Connection

Finally, there must be "a causal link between the pre-existing disability that was concealed and the disability incurred during the voyage." *McCorpen*, 396 F.2d at 549. "To find the requisite 'connection,' courts have looked to whether the injuries were identical or produced identical or substantially similar symptoms in the same part of the body." *Jenkins v. Aries Marine Corp.*, 590 F. Supp. 2d 807, 813 (E.D. La. 2008) (citations omitted). A causal connection exists where a plaintiff claims an injury in the exact same location. *See Brown*, 410 F.3d at 176 (citations omitted). Defendant asserts that Plaintiff has the same medical condition she had prior to her employment with ARTCO (lupus), she takes the same medication, and she complained of similar symptoms in the same part of her body.

Plaintiff first learned she had lupus in 1986. According to Plaintiff's orthopedic surgeon, Dr. Jefferson, lupus is an autoimmune disease that can cause nerve or joint pain and damage tendons, making them easier to tear. In 1992, Plaintiff applied for Social Security disability benefits, asserting that she was unable to work due to lupus, but the Social Security Administration ("SSA") determined her condition was not serious enough to prevent her from working. Plaintiff sought reconsideration of the decision, noting that she had also developed

13

back problems and depression.  The SSA again determined that Plaintiff was not disabled.

Plaintiff eventually obtained Social Security benefits in 1994, her disability being based on

lupus, venous thrombosis, obesity, affective disorder, and disc disease of the back and neck.

On one of the forms completed by Plaintiff in applying for Social Security benefits, she

indicated that she could not hold a bowling ball after two tries and that she did not feel safe

driving because her hands would go numb.  Another form reports that she has lost some muscle

control in her hands.  A consultative examination by Dr. Pete Ward on November 14, 2007,

noted that Plaintiff "has no energy and no strength, that her joints hurt, including her ankles,

knees, wrists, elbows and shoulders and all of her back but she says not all at the same time."

Dr. Ward Exam., DN 23-9, p. 47.  In Plaintiff's 2009 application for Social Security benefits,

following her October 2, 2008, injury, she notes that she can't use her hand when it is numb.

She also complains of pain and nerve damages in her right arm.  Dr. Emily Kenner's consultative

examination states that Plaintiff has never taken steroids for lupus, but instead takes ibuprofen

and NSAIDs to fully control the joint pain caused by lupus.  In contrast, Dr. Kenner notes that

Plaintiff described her arm pain following October 2, 2008, as a shooting/burning pain.

The Court finds that the evidence establishes a causal connection between Plaintiff's

concealed medical information and her injury aboard the M/V COOPERATIVE SPIRIT.  Prior

to October 2, 2008, Plaintiff raised complaints of numbness and pain in her hands and joints.

The expert testimony in this case establishes that lupus can cause such symptoms.  For instance,

Dr. Beatty testified that lupus can cause joint pain, weakness and numbness of the hands and

arms, and can affect the nervous system and connective tissues.  Dr. Beatty Depo., DN 23-32, p.

34.  Following her injury on October 2, 2008, Plaintiff complained of numbness in her hand and

arm pain.  The Court finds that this is sufficient to establish a causal connection, as the

symptoms are substantially similar and in the same location.  Accordingly, Defendant's motion

for summary judgment as to Plaintiff's claim for maintenance and cure is granted because

Defendant has demonstrated that the *McCorpen* defense bars Plaintiff from recovering.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion for

Summary Judgment is GRANTED IN PART and DENIED IN PART.